Charles R. CRAIG, for himself and for all others similarly situated, Plaintiffs,

Dorothy D. Moore, Plaintiff-Appellant,

v.

ALABAMA STATE UNIVERSITY; Levi Watkins, individually and in his official capacity as President of Alabama State University; the Board of Trustees of Alabama State University; Mrs. L.W. Noonan; Dr. R.J. McLaughlin; Mayor Andrew M. Hayden; Ross Dunn; Robert L. Potts; Tom Radney; Lewis J. Willie; Mayor A.A. Chandler; and Robert L. Glynn, individually and in their official capacities as Members of the Board of Trustees of Alabama State University; Ed Moss; Dr. Aaron Van Wright and Isaac Sanders, Defendants-Appellees.

No. 85–7325.

United States Circuit Court, Eleventh Circuit.

Nov. 18, 1986.

Alexander W. Jones, Jr., Pritchard, McCall, Jones, Spencer & O'Kelley, F. Hilton-Green Tomlinson, Robert L. Wiggins, Jr., Gordon, Silberman, Wiggins & Childs, Robert F. Childs, Jr., Birmingham, Ala., for plaintiff-appellant.

Solomon S. Seay, Jr., Montgomery, Ala., for defendants-appellees.

Before TJOFLAT and ANDERSON Circuit Judges, and MORGAN, Senior Circuit Judge.

MORGAN, Senior Circuit Judge:

Appellant Dorothy Moore appeals from an adverse decision rendered below on the merits of her claim brought under Title VII of the Civil Rights Act alleging racial discrimination by Alabama State University in relation to her application for employment. The appellant contends that the lower court erred in failing to properly apply disparate impact analysis to the facts of this case. Having reviewed the record, we agree that the district court's analysis was flawed and reverse and remand for determination of the appropriate remedy.

## I.

This lawsuit has its genesis in an earlier discrimination suit leveled against Alabama State University (ASU) in the 1970's. In that suit, styled *Craig v. Alabama State University*, 451 F.Supp. 1207 (M.D.Ala. 1978), then District Judge Frank M. Johnson, Jr. found that Alabama State University had engaged in a pattern and practice of discrimination against whites in the hiring of administrative, clerical and support staff, as well as faculty. That finding culminated in appropriate injunctive relief forbidding any further discrimination on the part of ASU in all aspects of hiring practices at the university. The instant case was filed as a continuation of these prior proceedings in the form of a Motion For Contempt alleging that the defendants had violated the court's 1978 injunction prohibiting discriminatory employment practices.

The facts from which the Motion For Contempt arose involved appellant Dorothy Moore's application for the position of Federal Relations Director at ASU in 1983. Many of the facts underlying her claim, as found by the district court, are largely undisputed, and we of course accept the factual findings of the district court as correct unless clearly erroneous. *See Pullman-Standard v. Swint*, 456 U.S. 273, 289–90, 102 S.Ct. 1781, 1790–91, 72 L.Ed.2d 66 (1982). The district court found that the appellant is a white female who in 1983 approached Dr. Robert Randolph, the President of ASU, in search of a position at the institution. She was advised that although nothing was presently available, if grant funds could be obtained she could be employed on a temporary basis. Subsequently, in light of indications that the appellant had obtained such a grant commitment to commence later in the year, Randolph employed her on an interim basis in the job of Acting Assistant Director of Federal Relations.[1] That position bore the responsibility of acquiring grants for the university.

At the time the appellant assumed the position, she was given two contracts. The first covered the limited period of July 1 to September 30, 1983, and the second from October 1, 1983 to September 28, 1984. At the time that the appellant assumed the position, it was understood that eventually the opening would have to be advertised according to university policy for permanent positions, although the president did have authority to fill such positions in the interim. Thereafter, at a meeting of the Board of Trustees of ASU on August 15, 1983, the matter of appellant Moore's employment came to the attention of the Board. The Board was not apprised of her second contract, and accordingly concluded that its obligation to Ms. Moore ceased upon the expiration of the first contract. After the Board meeting, Dr. Randolph contacted the appellant and informed her that in light of the Board's posture, her contract would "self-destruct" at the end of the first contract. The plaintiff testified and the district court found, that at that point she voluntarily "stepped aside" from

---

1. Moore was actually hired under the title of Assistant Director of University Relations. Testimony at trial indicated that the university relations position and the federal relations position were essentially one in the same. The reason for the difference in the titles relates to a pro-posed organizational change that never took place and is not relevant to the issues at hand. The district court apparently utilized only the title of Director of Federal Relations, and for purposes of uniformity, we shall also.

the second contract based upon assurances that the job would have to be advertised and that she should apply for it. The position was thereafter advertised in *The Chronicle of Higher Education* dated August 31, 1983, with applications being invited until the deadline of September 30, 1983. Close to this time, a Search Committee was formed to review applications for the Director of Federal Relations position.

In the meantime, another set of events was transpiring which would have a direct effect upon the appellant's application for the position of Director of Federal Relations. In August of 1983, Ms. Jacqueline Mallory Williams contacted ASU and advised the university that she was now available for re-employment pursuant to a study leave agreement that she had entered with the university on September 25, 1981. Mrs. Williams, who is black, had been employed at the university since 1964. Prior to taking study leave, she had been an assistant to Dr. Randolph's predecessor, Dr. Levi Watkins. The letter agreement provided that Ms. Williams would be granted a two-year study leave to pursue her doctorate degree at the University of Alabama at Tuscaloosa, during which time she would continue to receive a partial salary from ASU. Upon completion of her studies, the agreement provided for her return to ASU in a "faculty or other mutually acceptable position" at her previous salary, which was $31,420.00 per year. Early in September of 1983, Ms. Williams again contacted the university regarding her availability and a list of potential vacant positions was compiled for her scrutiny. Only one of the available positions, Athletic Director, provided a salary commensurate with Ms. Williams' previous salary.

On September 24, 1983, the Board of Trustees for ASU met again. At that meeting Dr. Randolph recommended to the Board that Ms. Williams be hired as Director of Federal Relations, a position that she had expressed some interest in shortly before the meeting, and the Board accepted this recommendation. Although the position had an advertised salary range of $21,000–$25,000 per year, Ms. Williams' contract was issued in the amount of $31,420.00, concomitant with her salary prior to taking study leave. After this action was taken on September 24, 1983, the appellant filed an application for the position on September 30, 1983, inasmuch as she was not informed that the position had been given to Ms. Williams. The parties stipulated that the Search Committee was disbanded without having reviewed any applications, and the Board considered only Ms. Williams' qualifications in making the decision to fill the position. Although the position was filled before the close of the application period, none of the applicants, including the appellant, were notified of that fact until sometime in October of 1983.

In sum, the district court found that both the appellant and Ms. Williams were qualified for the position of Director of Federal Relations. Although the university had a policy allowing the appointment of temporary employees to fill vacancies, those temporary employees received no enhanced rights regarding permanent appointment to the position vis-a-vis other applicants. The court concluded that "Ms. Williams was hired as Director of Federal Relations because of the obligation of the University to find her a 'mutually acceptable' job upon her return from study leave and that the position of Director of Federal Relations was the only available job which met the requirements of the University's obligations and was consistent with Ms. Williams' qualifications." [Rec. at 097].

On appeal, the appellant raises only one challenge to the adverse decision below—that the district court erred in its application of disparate impact analysis to the aforementioned factual findings.[2]

## II.

Disparate impact analysis in Title VII cases emanates from the Supreme Court

---

**2.** The appellant also raised a Title VII claim for disparate treatment and a breach of contract claim arising out of the cancellation of her second contract. The district court's adverse rulings on these claims are not on appeal here.

case of *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971) and its offspring. *See, e.g., Albemarle Paper Co. v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975); *Dothard v. Rawlinson*, 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977). These cases set forth a tripartite scheme of analysis for employment practices that are "fair in form, but discriminatory in operation." First, to establish a prima facie case of discrimination in such cases, the complaining party must demonstrate that the defendant employed a facially neutral employment practice that had a significant discriminatory impact. The burden then shifts to the employer to show that the challenged employment practice has a "manifest relationship" to the employment in question, or in other words that it is supported by "business necessity." *See Griggs*, 401 U.S. at 431–32, 91 S.Ct. at 853–54, 28 L.Ed.2d at 164–65. Should the employer carry that burden, the employee must still be provided the opportunity to demonstrate that the employer was using the practice as a pretext for discrimination or that other criteria were available with a lesser adverse impact on the minority that would still serve the employer's needs. *See Albemarle Paper Co.*, 422 U.S. at 425, 95 S.Ct. at 2375, 45 L.Ed.2d at 301.

The first task in this case, therefore, is to determine whether the appellant carried her burden of demonstrating that the defendant engaged in a facially neutral employment policy or practice that had a significant discriminatory impact on white persons. *Griggs* counsels that disparate impact is shown not only where a direct adverse impact can be shown, but also where

"practices, procedures, or tests neutral on their face, and even neutral in terms of intent, ... operate to 'freeze' the status quo of prior discriminatory employment practices." 401 U.S. at 430, 91 S.Ct. at 853, 28 L.Ed.2d at 163. *See also Giles v. Ireland*, 742 F.2d 1366, 1379–81 (11th Cir. 1984).

The appellant urges that ASU had an employment practice of granting hiring preferences to its current employees embodied by the individual study leave agreement entered with Williams. The district court found that this agreement represented the university's study leave policy.[3] A preference to hire from within is facially neutral—all outside applicants, regardless of race, are excluded from consideration for a vacancy being filled. But where, as here, the employer in the past exercised a pattern of racial discrimination, the failure to consider outside applicants necessarily impacts more harshly on minorities because the preference operates to their total exclusion and to the benefit of the employer's racially skewed workforce.[4] In analogous reasoning, the Tenth Circuit has observed that "It is beyond argument that a rating procedure used by an historically segregated employer which favors applicants already employed full-time falls squarely within the prohibition of *Griggs*." *Thornton v. Coffey*, 618 F.2d 686, 691 (10th Cir. 1980). Judge Johnson's earlier decision in *Craig* establishes that ASU engaged in purposeful discrimination in all phases of employment practices resulting in an overwhelming imbalance in the racial composition of its workforce, *see* 451 F.Supp. at 1208, that persists virtually unchanged.[5]

---

**3.** Rec. at 096; 101.

**4.** The following excerpts are taken from the university's compliance reports filed pursuant to the *Craig* injunction:

ALABAMA STATE UNIVERSITY
WORKFORCE PERCENTAGES

| | Oct. 1978 | Oct. 1981 | Nov. 1984 |
|---|---|---|---|
| ADMINISTRATIVE | | | |
| White | 6% | 13% | 10% |
| Black | 94% | 87% | 90% |

| | Oct. 1978 | Oct. 1981 | Nov. 1984 |
|---|---|---|---|
| INSTRUCTIONAL | | | |
| White | 22% | 29% | 25% |
| Black | 70% | 64% | 67% |
| PROFESSIONAL | | | |
| White | 6% | 8% | 3% |
| Black | 94% | 92% | 95% |

**5.** In this regard, the lower court concluded:

While this Court was disturbed by some of the testimony with respect to efforts being

The utilization of a hiring preference in such circumstances, as we see it, is the plainest means possible of perpetuating the status quo of a racially imbalanced workforce.

■ Although the appellees' contentions are far from clear, they contend that disparate impact analysis is inappropriate as to individual, rather than class, claims and that an "ad hoc" or "one shot" application of a selection criteria cannot have a disparate impact. Any given case, however, may be analyzed in terms of disparate treatment or disparate impact, *Teamsters v. United States*, 431 U.S. 324, 338 n. 15, 97 S.Ct. 1843, 1855 n. 15, 52 L.Ed.2d 396, 415 n. 15 (1977), and as the Supreme Court observed in *Connecticut v. Teal*, 457 U.S. 440, 455–56, 102 S.Ct. 2525, 2535, 73 L.Ed.2d 130, 143 (1982), every *individual* employee is protected against discriminatory treatment *and* neutral practices that are discriminatory in operation. Relying upon such reasoning, two courts have explicitly concluded that disparate impact claims may be brought by aggrieved individuals in a private, non-class action. *See Lasso v. Woodmen of World Life Ins. Co.*, 741 F.2d 1241, 1245 (10th Cir.1984), *cert. denied*, 471 U.S. 1099, 105 S.Ct. 2320, 85 L.Ed.2d 839 (1985); *Rule v. International Ass'n of Bridge, Structural and Ornamental Ironworkers*, 568 F.2d 558, 566 (8th Cir. 1977). Numerous other courts have implicitly concluded as much by applying disparate impact analysis to individual claims

pending before them. *See Nash v. Consolidated City of Jacksonville*, 763 F.2d 1393, 1397 (11th Cir.1985); *Walker v. Jefferson County Home*, 726 F.2d 1554, 1557 (11th Cir.1984). We perceive no impediment to using disparate impact analysis as to the appellant's individual claim.

The appellees also contend that an "ad hoc" application of a selection criteria cannot have a disparate impact, although they cite no authority for this proposition. Most of the authority we have found seems to support this view, although there are also indications to the contrary. *Compare Peters v. Lieuallen*, 746 F.2d 1390, 1392 (9th Cir.1984); *Yartzoff v. State of Oregon*, 745 F.2d 557, 558–59 (9th Cir.1984); *Massarsky v. General Motors Corp.*, 706 F.2d 111, 121 (3rd Cir.), *cert. denied*, 464 U.S. 937, 104 S.Ct. 348, 78 L.Ed.2d 314 (1983); *Coe v. Yellow Freight System, Inc.*, 646 F.2d 444, 451 (10th Cir.1981), *with Walker v. Jefferson County Home*, 726 F.2d 1554, 1558 (11th Cir.1984); *Massarsky v. General Motors Corp.*, 706 F.2d at 130–31 (Sloviter, J., dissenting); *Thornton v. Coffey*, 618 F.2d 686, 690–91 (10th Cir.1980). *Walker*, the decision from this circuit, involved an individual disparate impact claim brought by an employee of the county home challenging her failure to receive the position of Housekeeping Department supervisor. The home had established a requirement of prior supervisory experience as a qualification for the position, which was neutral on its face because it applied to all applicants. The requirement had an adverse effect on

made to comply with the letter and spirit of the *Craig* order at ASU, this is not a matter which moves this Court to action under *Craig*. The testimony at trial, however, which did relate to compliance with *Craig*, has moved this Court to a determination that future *Craig* compliance reports shall be more carefully scrutinized.

Rec. at 106. Testimony at trial indicated that ASU has had an affirmative action plan in place since 1978, see Plaintiff's Exhibit No. 26, that went unused and was virtually inoperative from at least 1980–1985. *See* Rec. at 123; 141–44; 373–74. Furthermore, we note that the *Craig* injunction directed that the university file compliance reports at six month intervals setting forth "by category (administrative, teaching,

clerical, and support) and race, the staff employed, applications received, new hirees, and tenure and promotions granted." Supp.Rec. at 145. Although Moore was reported as a new white hire, Defendant's Exhibit No. 22, at 6; Defendant's Exhibit No. 25, at 4, the reports from the relevant period do not report the hiring of Williams into the Director of Federal Relations position at all as either a "new hire" or a "promotion." Defendant's Exhibit Nos. 22 and 23. Presumably, this was because of testimony at trial that since Williams was never taken off of the university's payroll, she was "reassigned" to the Director's position. Nevertheless, it certainly raises questions as to whether those taking study leave are properly reported under the *Craig* injunction.

black employees, however, because of the home's prior discrimination in favoring whites for promotion into positions in which the supervisory experience could be obtained. The court therefore found a prima facie case of disparate impact on the black employees as a class while analyzing the impact of the supervisory experience criteria only in the context of the one supervisory position at issue, which was awarded to a white employee who had prior supervisory experience. 726 F.2d at 1558.

Even if *Walker* is not determinative here, the appellees' "ad hoc" theory fails factually based upon the record adduced below. As noted earlier, the district court found that Williams' study leave agreement constituted the university's study leave policy. At trial, Jacqueline Williams

identified a list of 99 persons who had taken study leave from the university during the tenure of Dr. Watkins as president. From that list, she identified numerous persons aside from herself who had taken non-academic study leave.[6] This testimony was sufficient to rebut the appellees' contention that the hiring preference shown as to Ms. Williams was nothing more than an "isolated" or "ad hoc" occurrence.[7]

■ Finally, in regard to the appellant's initial burden, the real heart of the appellees' argument seems to be the lower court's conclusion that the university acted as it did in response to its contractual obligation to Williams, and that therefore there was no "hiring preference" involved in the selection of the Director of Federal Rela-

---

**6.** *See* Rec. at 290–98; Defendant's Exhibit No. 42, at 52–53.

**7.** The logical corollary of this argument, which the appellees may be asserting, is that this factual showing does not demonstrate disparate impact because the appellant did not produce a statistical breakdown of the racial makeup of employees who took study leave. Rather, the appellant must rely solely on the statistical evidence that the university's workforce was 70% to 90 percent black in most relevant categories, *see supra* note 4, and therefore the practice of giving a preference to members of the workforce weighs more heavily on whites, or at least perpetuates the status quo. We recognize that a "plaintiff must not merely prove circumstances raising an inference of discriminatory impact; he must prove the discriminatory impact at issue." *Johnson v. Uncle Ben's, Inc.,* 657 F.2d 750, 753 (5th Cir.1981), *cert. denied,* 459 U.S. 967, 103 S.Ct. 293, 74 L.Ed.2d 277 (1982). Nevertheless, the appellees have not cited any authority for the proposition that the *only* way of proving that impact is through statistics of the actual racial composition produced through operation of the criteria. Rather, as the Fourth Circuit observed in *Mitchell v. Board of Trustees of Pickens County,* 599 F.2d 582, 585 n. 7 (4th Cir.), *cert. denied,* 444 U.S. 965, 100 S.Ct. 453, 62 L.Ed.2d 378 (1979):

Statistical proof of actual applications is not of course indispensable to proving the disparate impact *prima facie* case, particularly where, as here, the action is individual and not class. Circumstantial evidence, complemented by judicial notice to show that a facially neutral policy must in the ordinary course have a disparate impact on a protected group of which an individual plaintiff is a member is often utilized.

*See also Wright v. National Archives & Records Service,* 609 F.2d 702, 712 (4th Cir.1979) (recognizing *Mitchell* in context of a race claim). In *Geller v. Markham,* 635 F.2d 1027, 1032 (2d Cir.1980), *cert. denied,* 451 U.S. 945, 101 S.Ct. 2028, 68 L.Ed.2d 332 (1981), the court found a policy that made over 90 percent of the protected age class ineligible for hiring to be discriminatory as a matter of law "since, absent countervailing statistics, the likelihood of a [protected] person ... being selected under the policy would be substantially less than that of a [nonprotected] person...." In line with such reasoning, in *Walker* we eschewed statistical analysis altogether in a perpetuation of prior discrimination case where actual impact was shown on the individual minority member and the discriminatory impact was obvious from the record. And as the Supreme Court has cautioned in regard to reliance on statistics, a plaintiff is "not required to exhaust every possible source of evidence, if the evidence actually presented on its face conspicuously demonstrates a job requirement's grossly discriminatory impact." *Dothard v. Rawlinson,* 433 U.S. 321, 331, 97 S.Ct. 2720, 2727, 53 L.Ed.2d 786, 798 (1977). In short, the workforce composition statistics are not so weak as to merely raise an "inference" based upon speculation or conjecture. *See Sakellar v. Lockheed Missile and Space Co.,* 765 F.2d 1453, 1456–57 (9th Cir. 1985); *Massarsky v. General Motors Corp.,* 706 F.2d 111, 121 & n. 18 (3d Cir.), *cert. denied,* 464 U.S. 937, 104 S.Ct. 348, 78 L.Ed.2d 314 (1983). Rather, we view them as strong probative evidence that a hiring preference granted employees within the workforce will perpetuate that racial imbalance sufficient to carry the appellant's initial burden of proof.

tions.[8] It appears to us, however, that the form taken by the selection criteria (i.e., as a contractual obligation) is irrelevant to the inquiry at hand. The university was under no compulsion to enter the study leave contract with Williams. In fact, because of its prior discriminatory employment practices, the university had an obligation under *Griggs* to not utilize selection criteria that maintain the status quo of its racially imbalanced workforce. It is circuitous indeed to reason that the university can avoid that obligation by *voluntarily* entering contracts with individual employees that have just that effect, and then set up those contractual obligations as a defense to the discriminatory effects flowing therefrom. *Compare W.R. Grace & Co. v. Local Union 759*, 461 U.S. 757, 103 S.Ct. 2177, 76 L.Ed.2d 298 (1983) (where company voluntarily entered both conflicting collective bargaining agreement and conciliation agreement, and the company chose to violate the collective agreement in making layoffs in order to avoid Title VII liability, public policy did not forbid liability under the collective agreement because the company was "cornered by its own actions");

*Williams v. New Orleans Steamship Ass'n*, 673 F.2d 742, 750–51 (5th Cir.1982) (rights under Title VII cannot be bargained away; the fact that a contract limits employment opportunities is no justification if the result is discriminating) (citations omitted), *cert. denied*, 460 U.S. 1038, 103 S.Ct. 1428, 75 L.Ed.2d 789 (1983).

The contractual nature of the hiring preference does not negate whatever disparate effect it may have. Rather, the university's interests in the contract in this regard are adequately accounted for in determining the business necessity for entering the contract and granting the resulting hiring preference. In short, there was evidence of numerous instances of study leave occurring at the university. Granting such hiring preferences in the form of study leave to a workforce already established as racially unbalanced through prior discrimination necessarily falls more heavily on minorities who are not considered for positions filled by those favored employees. We conclude that under the facts of this case, the appellant has made a showing of a hiring preference with a disparate impact on minority applicants.[9]

**8.** The lower court undertook no discernible analysis in finding no hiring preference, which leaves us somewhat in the dark as to its exact reasoning in making that finding. It appears unlikely, however, that the court concluded as a pure *factual* finding that there was no hiring preference afforded Williams here. The study leave contract on its face states an obligation to reemploy Williams, which the university unquestionably treated as entitling her to whatever position it deemed acceptable without considering the effect on any other applicants. *See, e.g.,* Rec. at 36; 392; 410–11. Any finding to the contrary would be clearly erroneous. *See Anderson v. City of Bessemer City*, 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518, 528 (1985).

**9.** The appellant has argued that the university's Nonacademic Staff Handbook, which explicitly states a hiring priority for present university employees over outside applicants, also created a hiring preference amenable to disparate impact analysis. The appellees attempt to disavow any relationship between this general hiring preference and this case urging that the Director of Federal Relations position was of a different sort than those positions covered by the Handbook. On one hand, the Handbook makes no such distinction and on its face appears to apply to all nonacademic positions. Our examination

of the record reveals no significant deviation in this case from the hiring procedures set forth in the Handbook that would indicate that the Handbook policy does not apply to the Director position. On the other hand, there is no affirmative evidence in the record indicating that the Board recognized and considered this general policy in filling the Director's position. A fair reading of the lower court's opinion indicates that it found that the university acted *solely* because of its contractual obligation to Williams, and that finding would implicitly negate the appellant's attempt to bring this case under the operation of the general Handbook policy. The question of whether the Board acted pursuant to Williams' contractual preference, or pursuant to the general Handbook preference, or both, in filling the Director position is a finding of fact that may not be overturned unless clearly erroneous. Fed.R.Civ.P. 52(a). In light of the policy's seemingly clear application to all nonacademic positions, we might well have reached the conclusion that the general policy was a factor in the Board's actions were we afforded the opportunity for independent review. Under the clearly erroneous standard, however, the district court's conclusion is "plausible" based upon the record as a whole, and we are therefore bound by its finding. *See Ander-*

### III.

Although finding to the contrary, the district court assumed for purposes of analysis that the plaintiff had established a facially neutral hiring preference with disparate impact. The court then turned its attention to the defendant's burden of demonstrating business necessity, which it found because the "practice of granting leave to faculty members and administrative members to pursue advanced study serves a university's interest in getting better qualified personnel." Rec. at 105. The court opined that the logical conclusion of the appellant's argument was that ASU could never maintain a study leave policy, for any obligation to rehire former employees would perpetuate the prior system found to be discriminatory under *Craig.* The court observed that to find in the appellant's favor would undermine one of the functions of a university—to provide its students with well-trained faculty. And finally, the court concluded that there had been no showing that an inordinate number of vacancies were filled with faculty members returning from study leave; therefore, other vacancies existed for hiring pursuant to the requisites of *Craig.*

■ The former Fifth Circuit in numerous decisions still binding in this circuit [10] has set forth standards to be followed in considering whether business necessity has been sufficiently established in a given case.

The test is whether there exists an overriding legitimate business purpose such that the practice is necessary to the safe and efficient operation of the business. Thus, the business purpose must be sufficiently compelling to override any racial impact; the challenged practice must effectively carry out the business purpose it is alleged to serve; and there must be available no acceptable alternative policies or practices which would better accomplish the business purpose advanced or accomplish it equally well with lesser differential racial impact.

*Pettway v. American Cast Iron Pipe Co.,* 494 F.2d 211, 245 (5th Cir.1974), *citing Robinson v. Lorillard Corp.,* 444 F.2d 791, 798 (4th Cir.), *cert. dismissed,* 404 U.S. 1006, 92 S.Ct. 573, 30 L.Ed.2d 655 (1971). *Accord Crawford v. Western Electric Co.,* 745 F.2d 1373, 1385 (11th Cir.1984); *Jackson v. Seaboard Coast Line Rd. Co.,* 678 F.2d 992, 1016 (11th Cir.1982). To sustain scrutiny, a practice with discriminatory impact must "not only *foster* safety and efficiency, but must be *essential* to that goal." *Pettway,* 494 F.2d at 244 n. 87, *citing United States v. St. Louis San Francisco Railway Co.,* 464 F.2d 301, 308 (8th Cir.1972) (en banc) (citations omitted), *cert. denied,* 409 U.S. 1116, 93 S.Ct. 913, 34 L.Ed.2d 700 (1973). *Accord Parson v. Kaiser Aluminum & Chemical Corp.,* 575 F.2d 1374, 1389 (5th Cir.1978), *cert. denied,* 441 U.S. 968, 99 S.Ct. 2417, 60 L.Ed.2d 1073 (1979). The business necessity doctrine is "very narrow," *Parson,* 575 F.2d at 1389, and the employer bears the burden of not only articulating but also *proving* business necessity through the evidence. *See Johnson v. Uncle Ben's, Inc.,* 657 F.2d 750, 752 (5th Cir.1981), *cert. denied,* 459 U.S. 967, 103 S.Ct. 293, 74 L.Ed.2d 277 (1982). Having carefully reviewed the record, we find that the appellees have not carried their burden of establishing business necessity.

■ First and foremost, we find absolutely no *evidence* adduced at trial to support the conclusion that a study leave policy with resulting hiring preference is necessary to promote a more qualified staff. There simply was no testimony presented at trial addressing any need or justification for a study leave policy, or even explaining why a university such as ASU would be compelled to utilize such a policy. Rather, as the appellant urges, it appears that the

---

son v. City of Bessemer City, 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518, 528 (1985); *Pullman-Standard v. Swint,* 456 U.S. 273, 287, 102 S.Ct. 1781, 72 L.Ed.2d 66, 79 (1982).

10. Decisions of the former Fifth Circuit rendered prior to October 1, 1981, are binding precedent in this circuit. *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc).

district court made its finding of business necessity based upon a common sense notion that more education would necessarily improve the staff of the university. But it must be remembered that the prior discriminatory practices of ASU have created an artificially narrow workforce at the university based upon race, rather than based upon pure qualifications to perform a particular job. That racially constricted workforce, existing in a vacuum, would undoubtedly be enhanced through further education. It can be argued, however, that the university might better achieve its goal of improving its workforce by opening up all hiring decisions for vacant positions to the widest range of qualified persons possible, rather than resorting to promotion through educational incentives from within its own racially skewed workforce. As the appellant observes, there is no basis in this record to conclude that the educational leave policy would have been needed if the university had simply allowed all applicants, including the now-accessible pool of white applicants, to compete equally with current employees for future vacancies.

This reasoning is supported by what transpired in this case. Jacqueline Williams received a study leave agreement entitling her to two years partial salary to pursue her doctorate degree. Upon her return from the leave, she was placed into the Director of Federal Relations position without consideration of any other of the persons who had applied for the position. The evidence at trial indicated that she received approximately $6,000 salary per year more than the highest rated salary at which the position was advertised. The position only called for a Masters' Degree,[11] which she possessed prior to taking her study leave, and the evidence at trial established that her course of study bore no particular relationship to the duties to be carried out in the federal relations position.[12] Although she was found "qualified" by the district court in the sense of possessing minimal qualifications for the position (as was the appellant), even the appellees' own expert witness rated Williams as the fifth highest qualified applicant behind four others.[13] In short, it is simply conjecture to contend that the leave policy in the instant case resulted in improvement of the university's administrative staff, as completion of the aborted search progress may well have resulted in employment of a more-qualified applicant at a lower salary.[14]

11. *See* Plaintiff's Exhibit No. 12 (advertisement in *The Chronicle of Higher Education*).

12. *See* Rec. at 149; 236–43. Williams' graduate course work was in Higher Education Administration. Although she had completed her coursework, she had not completed her dissertation at the time she returned to ASU, and therefore had not received her degree. Rec. at 272. Furthermore, much of the testimony concerning Williams' knowledge of obtaining grant monies came from exposure she had to grant proposals while working as Dr. Watkins' assistant, *prior* to leaving for study leave. Rec. at 248–50; 276–80; 305–06.

13. This witness, ASU's former Director of Federal Relations Isaac Sanders, ranked no applicants below Williams, and therefore he did not rank Moore in relation to Williams. Rec. at 313–14. In contrast, Dr. Randolph testified that he felt Moore was more qualified for the position than Williams, Rec. at 50, as did Dr. Gary Smith, the head of the search committee that never met. Rec. at 148. Dr. Carl Grafton, professor of political government at Auburn University at Montgomery, testified that Moore's masters in political science "very much" qualified her for a

grantsman position such as here. Rec. at 163–64.

14. The appellees contend that because Moore was not among the top five applicants, she would not have received the appointment even if the selection process had remained open, and that therefore she has no claim. They rely on *Hereford v. Huntsville,* 574 F.2d 268 (5th Cir. 1978). *Hereford,* however, was a disparate treatment case and the evidence of qualifications was relevant to the question of the employer's motives in making the challenged promotions. *See also McCarthney v. Griffin-Spalding County Bd. of Education,* 791 F.2d 1549, 1552 (11th Cir.1986). Motive is irrelevant, however, in a disparate impact case, *Griggs,* 401 U.S. at 430, 91 S.Ct. at 853, 28 L.Ed.2d at 163, and a plaintiff in a disparate impact case "need not prove ... that he would have been the most qualified individual for the jobs...." *Hung Ping Wang v. Hoffman,* 694 F.2d 1146, 1148 (9th Cir.1982), *citing, Pettway v. American Cast Iron Pipe Co.,* 494 F.2d 211, 240–45 (5th Cir.1974), *cert. denied,* 439 U.S. 1115, 99 S.Ct. 1020, 59 L.Ed.2d 74 (1979). At any rate, the appellees make factual assumptions not evident on this

We reiterate that this case simply involves a failure on the part of the university to bear its burden of establishing business necessity for the hiring preference granted its existing employee. That the university did not carry its burden in this case does not, as the appellee contends, mandate the conclusion that ASU could never employ a study leave program. The policy involved here concerned leave for a member of the administrative staff, rather than for a member of the faculty. The terms under which the leave was granted included that the employee could return to a "mutually acceptable" position, which could mean virtually anything. Significantly, the policy was devoid of any mention of return to a specific position, nor was the preference tied to a requirement that the course of study pursued while the employee was on leave in some way bear a particular relation to the requirements of the job being applied for. There are any number of variables that might be accounted for in considering the necessity for a particular study leave policy, which individually or in combination could make the resulting hiring preference justifiable or at least more palatable. But the study leave policy invoked here was nothing more than a blanket preference instituted regardless of the employee's qualifications for the position or the qualifications of other applicants for the position. The defendant has not shown such a preference to be justified by business necessity.[15]

### IV.

Having concluded that ASU failed to demonstrate job-relatedness or business necessity, we need not examine whether alternatives existed which would serve the employer's needs with lesser impact or wheth-er the practice was a pretext for discrimination. *See Walker*, 726 F.2d at 1559. Accordingly, the district court's judgment is REVERSED and we REMAND to that court for determination of the proper relief.

REVERSED and REMANDED

---

record. In short, there was conflicting evidence as to the relative qualifications of Moore and Williams, and even if there were applicants more qualified than either of them, there was also testimony at trial that many applicants offered jobs decline employment. Therefore, there is no factual basis upon which to conclude that Moore could not have received the appointment.

15. We also reject the district court's reasoning that because there had been no showing that an "inordinate" number of vacancies were filled through study leave, other vacancies existed for hiring pursuant to *Craig*. This is the type of argument rejected in *Connecticut v. Teal*, 457 U.S. 440, 102 S.Ct. 2525, 73 L.Ed.2d 130 (1982), where the Court concluded that the "bottom-line" would not excuse employment opportunities lost by individual minority members.