Emile STEPHEN, Plaintiff,

v.

PGA SHERATON RESORT, Defendant.

No. 86–8501–CIV–Gonzalez.

United States District Court,
S.D. Florida.

Sept. 11, 1987.

Mark Cullen, Cullen & Szymoniak P.A., Lake Worth, Fla., for plaintiff.

Robin Richard & Roy Watson, Adams, Coogler, Watson & Merkel P.A., West Palm Beach, Fla., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

GONZALEZ, District Judge.

**THIS CAUSE** comes before the court as a race discrimination action, brought under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, and 42 U.S.C. § 1981. The plaintiff, Emile Stephen, alleges that he was terminated from his job with the defendant, PGA Sheraton Resort Limited (PGA Sheraton), for racially discriminatory reasons. The section 1981 claim was tried to a jury which rendered its verdict.

The plaintiff advances two theories of recovery under Title VII. First, the plaintiff maintains that his termination from his job in the Purchasing Department at the PGA Sheraton, was the result of a discriminatory job classification system and subjective firing policy being utilized by the defendant. The plaintiff claims that this classification and termination procedure, although neutral on its face, has had an adverse impact on black persons, including the plaintiff.

Second, the plaintiff maintains that he was the victim of disparate treatment in that an individual not of the plaintiff's race made the same errors on the job as did the plaintiff, and that this individual was not discharged. The plaintiff argues that the defendant intended to discriminate against the plaintiff because of some racial animus directed against the plaintiff.

The court having considered the pleadings, the testimony of the witnesses, the documents in evidence, and the stipulations of the parties, hereby makes the following findings of fact and conclusions of law, as required by Rule 52 of the Federal Rules of Civil Procedure.

## FINDINGS OF FACT

1. The plaintiff, Emile Stephen, is a black male Haitian who worked as a purchasing clerk for the defendant, PGA Sheraton. The defendant, PGA Sheraton, is a hotel and resort located and doing business in Palm Beach County, Florida.

2. The plaintiff was employed with the defendant from November 13, 1985 until February 4, 1986. The plaintiff was hired at the rate of $5.50 per hour and was promised a $.50 per hour raise upon completion of ninety days of employment. The plaintiff's ninety day period would have ended February 10, 1986.

3. The plaintiff's immediate supervisor was Charles Spaulding, the Director of the Purchasing Department at PGA Sheraton. Mr. Spaulding, after discussing the matter with Ron Cooper, the Comptroller at PGA Sheraton, made the decision to terminate the plaintiff from his position as purchasing clerk with the defendant, PGA Sheraton.

4. The plaintiff had been placed in his job with the defendant, PGA Sheraton, by the Florida Job Service. The plaintiff's Job Service counselor, Kenneth Schullstrom, called the Personnel Department of PGA Sheraton on three occasions to follow up on the plaintiff's progress and was told each time that the plaintiff was doing well. The last follow up call was made on January 14, 1986. At that time Mr. Schullstrom was told that the Personnel Department thought the plaintiff was doing well and that the Personnel Department wished it had "a hundred more [employees] just like [the plaintiff]." The Job Service counselor never spoke with the plaintiff's direct supervisor.

5. The plaintiff's job responsibilities included keeping track of inventory, filling orders, typing, filing forms and making deliveries of supplies to many of the departments at PGA Sheraton. The plaintiff was required as part of his job responsibilities to take orders for the supplies that he was required to deliver. Witnesses from three separate departments at PGA Sheraton testified that the plaintiff could not understand English well enough to perform his assigned duty of bringing supplies to the various departments. The plaintiff's inability to understand English resulted in supplies being misdelivered. The plaintiff's use of English before this court substantiates the testimony of the witnesses for the defendant. At least one employee

had to obtain her own supplies on several occasions. The court finds the testimony of these witnesses to be credible.

6. One of the plaintiff's co-worker's, a native of Thailand, also had difficulty speaking English over the telephone, to the extent that this difficulty was noticed on a performance evaluation. The language problem, however, was described as "slight" in the co-worker's performance evaluation and his overall evaluation was quite good.

7. The plaintiff's supervisor met with the plaintiff on February 4, 1986, and informed the plaintiff that the plaintiff was being terminated from his position with the Purchasing Department. The supervisor, upon request from the plaintiff, wrote a letter of recommendation for the plaintiff. The letter characterized the plaintiff as a "hard working employee, [who] d[id] what was asked of him." Plaintiff's Exhibit 4. The plaintiff's supervisor testified that he wrote the letter because he felt sorry for the plaintiff, because the plaintiff had impressed him as being a nice person who had endeavored to perform his job. Judging the demeanor of the witness, the court accepts this testimony and finds it convincing.

8. Upon being relieved of his responsibilities in the Purchasing Department, the plaintiff was offered a job in the Housekeeping Department. The evidence admitted at trial established that the Housekeeping Department is composed mainly of black employees. In March 1985, there were four whites and fifty-eight blacks employed in that department. In March 1986, there were nine whites and fifty-six blacks working in the Housekeeping Department. The housekeeping position offered to the plaintiff entailed setting up for "banquets." It was also established that the housekeeping job was lower paying and offered less opportunity for advancement than the job in the Purchasing Department.

9. The plaintiff's job in the Purchasing Department remained vacant for approximately one month. It was eventually filled a black Jamaican male.

10. It was established at trial that the plaintiff lied on his job application with the defendant. The plaintiff had been fired by a previous employer, yet the plaintiff failed to disclose this on his job application. The plaintiff admitted at trial that when he filed his claim of discrimination with the Equal Opportunity Employment Commission he claimed that he had been replaced at the PGA Sheraton by a white individual, when in fact this was not true.

11. The plaintiff established through the use of statistics that the defendant maintained segregated job categories. The Personnel Director for the defendant testified that the geographic area from which the defendant recruited and hired the majority of its employees was Palm Beach County. The court accepts this testimony.

12. The Affirmative Action Coordinator for Palm Beach County testified that Palm Beach County had an affirmative action plan and sought to achieve fair minority representation in its various job categories, and that the County recruited most of its office and clerical employees from within the County.

13. The evidence adduced at trial showed the following regarding the representation of black employees in the overall work force at the PGA Sheraton:

**1576**

TABLE 1

Number of White and Black Employees in the PGA Sheraton Work Force 1983–1986

| EEO–1 Report from Payroll Period* | Total Work Force (Line 10) | Total White Work Force (Line 10, Columns B & G) | Total Black Work Force (Line 10, Columns C & H) |
|---|---|---|---|
| 12/28/83 | 474 | 346 (73%) | 120 (25%) |
| 12/26/84 | 430 | 299 (70%) | 117 (27%) |
| 9/26/85 | 934 | 266 (68%) | 110 (28%) |
| 1/87 | 390 | 264 (68%) | 101 (26%) |

* The EEO–1 report for the payroll period closest to the end of each calendar year was used.

From 1983 to 1986, black employees comprised 25% to 28% of the PGA Sheraton work force.

PGA Sheraton's EEO–1 reports show the following regarding the representation of black employees in its various job categories:

TABLE 2

| Year | Percentage of Blacks in PGA Sheraton Work Force | Percent of Officials & Managers Who Are Black | Percent of Professionals, Technicians, Sales Workers Who Are Black | Percent of Laborers Who Are Black |
|---|---|---|---|---|
| 1983 | 25% | 11% (6/56) | 0% (0/19) | 76% (35/46) |
| 1984 | 27% | 17% (9/52) | 0% (0/17) | 72.5% (29/40) |
| 1985 | 28% | 17% (8/48) | 0% (0/15) | 86% (32/37) |
| 1986 | 26% | 17% (9/53) | 0% (0/15) | 69% (24/35) |

| Year | Percentage of Blacks in the PGA Work Force | Percentage of Office and Clerical Who Are Black | Percent of Service Workers Who are Black |
|---|---|---|---|
| 1983 | 25% | 3% (2/67) | 29% (68/238) |
| 1984 | 27% | 12.5% (8/64) | 27% (57/208) |
| 1985 | 28% | 8% (4/53) | 26% (54/208) |
| 1986 | 26% | 8% (4/52) | 27% (56/205) |

From 1983 through 1986, there was a gross disparity between the percentage of black employees in the PGA Sheraton work force and the percentage of black employees in the job classifications of: (1) professional; (2) technical; (3) sales; and (4) office and clerical.

In 1983, 86 percent of the black employees were employed as laborers or service workers; in 1984, 74 percent were so employed; in 1985, 81 percent were so employed; and in 1986, 79 percent were so employed.

14. Regarding the percentage of black employees in the labor force in Palm Beach County, for comparison purposes, another employer (Palm Beach County) also having an affirmative action plan and drawing employees from the same geographic area reported the following on its 1986 EEO–41 Report:

TABLE 3

| Percent of Blacks in Work Force | Percent of Professionals Who Are Black | Percent of Office & Clerical (Admin. Support) Who Are Black | Percent of Service Workers Who Are Black |
|---|---|---|---|
| 20.3% | 18.1% | 22.2% | 27% |

15. The PGA Sheraton Summary Sheet for terminations within the probationary period from 1983–1986 shows that there were a large number of vacancies filled each year by the PGA Sheraton. This was corroborated by the testimony of the defendant's Personnel Director, Karen Smith, that newly hired employees were subject to a ninety day probationary period. Thus, the new hires, at an absolute minimum, are reflected by the number of terminations. In 1986, for example, there were eighty-seven terminations during probation from an overall work force of 390.

16. Palm Beach County's hiring statistics for 1986 show that black employees were available in the labor force in the various job classifications.

|  | Percent of Professionals/* New Hires Who Are Black | Percent of Office/Clerical** (Admin. Support) Who Are Black |
|---|---|---|
| 1986 | 15% (18/120) | 21% (33/154) |

* Line 76, Columns A, C & H, EEO–4 Report
** Line 80, Columns A, C & H, EEO–4 Report

17. The plaintiff also presented statistics in support of its claim that the defendant, PGA Sheraton, exhibited a pattern of discriminatory discharges. The evidence consists of the defendant's EEO–1 Reports and Summary Sheet regarding terminations in conjunction with the testimony of Karen Smith and Charles Spaulding and were introduced to show that supervisors had a great deal of discretion regarding the termination decision, particularly during the probationary period and that the procedure allowed for a great deal of subjectivity.

18. Regarding discharges, the number of white employees discharged by the PGA Sheraton during the employees' probationary period compared to the total number of whites in the work force shows the discharge rate for white employees from 1983–1986 was as follows:

TABLE 4

| White Number of Discharges / White Number of Employees | | | |
|---|---|---|---|
| | 1983 | $\frac{28}{346}$ | 8 percent |
| | 1984 | $\frac{18}{299}$ | 6 percent |
| | 1985 | $\frac{22}{266}$ | 8 percent |
| | 1986 | $\frac{22}{264}$ | 8 percent |

19. The number of black employees discharged by the PGA Sheraton during their probationary period compared to the total number of blacks in the PGA Sheraton work force shows the discharge rate for black employees from 1983 through 1986 was as follows:

TABLE 5

| Black Number of Discharges / Black Number of Employees | | | |
|---|---|---|---|
| | 1983 | $\frac{30}{120}$ | 25 percent |
| | 1984 | $\frac{38}{117}$ | 32 percent |
| | 1985 | $\frac{25}{110}$ | 23 percent |
| | 1986 | $\frac{22}{101}$ | 22 percent |

20. The plaintiff's evidence established that the discharge practices of the PGA Sheraton resulted in a significant adverse effect on on black employees with blacks being three to five times more likely to be discharged than whites from 1983–1986. This claim was unrebutted.

21. The possibility that this pattern of discharges could be attributed to random chance is highly unlikely. Expressed in terms of standard deviations:

| 1983 | (A) Total Discharges (Black & White) | (B) Actual Number of Blacks Discharged | (C) Expected Number* | (D) Difference Between Actual and Expected |
|---|---|---|---|---|
| | 58 | 30 | 25% – 14.5 | 15.5 |

| (E) Standard Deviation | | | (F) Number of Standard Deviations** |
|---|---|---|---|
| $\sqrt{\text{Total Discharges}}$ | × Percent of Black Employees | × Percent of Non-Black Employees | 4.7 |

\* The Expected Number represents the number of black employees who would have been fired if black employees were fired proportionately to their representation in the work force.

\*\* The formula for deriving the number of standard deviations is:

$$\frac{D}{E}$$ D being the difference between the actual and expected values
E being the standard deviation

**1984**

| (A) Total Discharges (Black & white) | (B) Actual Number of Blacks Discharged | (C) Expected Number | (D) Difference Between Actual and Expected |
|---|---|---|---|
| 56 | 38 | 27% – 15 | 23 |

(E)
Standard Deviation

(F)
Number of
Standard Deviations

$$\sqrt{\text{Total Discharges} \times \text{Percent of Black Employees} \times \text{Percent of Non-Black Employees}}$$

3.32

6.93

**1985**

| (A) Total Discharges (Black & white) | (B) Actual Number of Blacks Discharged | (C) Expected Number | (D) Difference Between Actual and Expected |
|---|---|---|---|
| 47 | 25 | 28% – 13 | 12 |

(E)
Standard Deviation

(F)
Number of
Standard Deviations

$$\sqrt{\text{Total Discharges} \times \text{Percent of Black Employees} \times \text{Percent of Non-Black Employees}}$$

3.08

7.47

**1986**

| (A) Total Discharges (Black & white) | (B) Actual Number of Blacks Discharged | (C) Expected Number | (D) Difference Between Actual and Expected |
|---|---|---|---|
| 44 | 22 | 26% – 11 | 11 |

(E)
Standard Deviation

(F)
Number of
Standard Deviations

$$\sqrt{\text{Total Discharges} \times \text{Percent of Black Employees} \times \text{Percent of Non-Black Employees}}$$

2.91

3.78

22. Had the plaintiff continued his employment with the defendant, he would have received a raise to $6.00 per hour on February 11, 1986. The wages the plaintiff would have received in 1986, would have totalled $11,040.00. The plaintiff's interim wages for the same period were $5,862.59 reflecting the difference in actual projected wages of $5,177.41 for 1986.

23. Through April 30, 1987, the plaintiff had earnings of $3,142.68 from his employment at St. Mary's Hospital in West Palm Beach, Florida, at the rate of $5.50 per hour for a forty hour work week. The plaintiff subsequently received five weeks of pay, thus increasing his 1987 earnings to $4,242.68. Had the plaintiff been employed at the PGA Sheraton he would have received $5,280.00 for the same period of time. The wage loss for 1987 is $1,037.32.

24. The total wages lost by the plaintiff are $6,214.73.

25. The fringe benefits offered by the defendant included health insurance, one meal per shift, and paid vactions. In addition, the defendant would have paid 7.15 percent of the plaintiff's wages into the social security fund. The plaintiff estimates that the value of all of these fringe benefits is twenty percent of the wage figure or $1,242.95. The defendant did not rebut the plaintiff's submissions.

26. The plaintiff's total lost wages and fringe benefits are $7,457.68.

## CONCLUSIONS OF LAW

1. This court has jurisdiction over the subject matter of this suit and the parties pursuant to 42 U.S.C. § 2000e and 28 U.S.C. § 1343(a)(4). All conditions precedent to the institution of this suit have been fulfilled.

2. The plaintiff has alleged two distinct bases for recovery under Title VII by presenting evidence in support of a disparate impact claim and a disparate treatment claim. The court makes the following conclusions of law separately with respect to each basis for recovery.

## DISPARATE IMPACT

3. Disparate impact claims challenge employment practices which are " 'fair in form, but discriminate in operation.' " *Craig v. Alabama State University*, 804 F.2d 682, 685 (11th Cir.1986) (quoting *Griggs v. Duke Power Company*, 401 U.S. 424, 430, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971)). A three-step process is employed in a case in which the plaintiff alleges disparate impact with respect to employment practices. *Id.* First, the plaintiff must state a *prima facie* case of discrimination. A *prima facie* case is established when the plaintiff demonstrates that the defendant utilized a "facially neutral employment practice that had a significant discriminatory impact." *Craig*, 804 F.2d at 685. If the plaintiff proves a *prima facie* case, the burden shifts to the employer to prove that the employment practice has a " 'manifest relation' to the employment in question, or in otherwords that it is supported by 'business necessity.' " *Id.* (quoting *Duke Power*, 401 U.S. at 431–32, 91 S.Ct. at 853–54).

Disparate impact may be shown through statistical evidence. *New York City Transit Authority v. Beaser*, 440 U.S. 568, 584, 99 S.Ct. 1355, 1365, 59 L.Ed.2d 587 (1979). A *prima facie* case of disparate treatment based upon statistical evidence may be rebutted by the defendant upon showing that the plaintiff's statistical proof is unreliable. *Eastland v. Tennessee Valley Authority*, 704 F.2d 613, 619 (11th Cir.1983), *cert. denied sub nom. James v. Tennessee Valley Authority*, 465 U.S. 1066, 104 S.Ct. 1415, 79 L.Ed.2d 741 (1984).

If the employer rebuts the *prima facie* case the burden is placed back on the plaintiff who then is given an opportunity to show that the practice is merely pretextual and that another less adverse practice is

available to the employer. *Craig*, 804 F.2d at 685.

■ 5. In the case *sub judice*, the plaintiff has presented evidence to buttress his claim that during the time the plaintiff was employed with the defendant, the defendant utilized a job classification scheme which had the effect of discriminating against blacks. The plaintiff presented statistical evidence to support this claim by showing that blacks are grossly under represented in the job classification of office and clerical workers, the category which most nearly corresponds to the plaintiff's position in the Purchasing Department. The plaintiff also presented statistics to substantiate his claim that during the time the plaintiff was employed with the defendant, the defendant was engaging in discriminatory discharge practices.

The defendant objected at trial to the introduction of the statistical evidence on the ground that the plaintiff failed to place the defendant on notice through his pleadings that the plaintiff was proceeding under a disparate impact theory. At trial, the defendant made no specific objections to the plaintiff's statistical evidence.

At the conclusion of the trial, the court instructed counsel for the parties to submit proposed findings of fact and conclusions of law to assist the court. In compliance with the court's instruction the defendant raised, for the first time, general objections to the plaintiff's statistical evidence. The defendant also renewed its objection to the plaintiff's attempt to make a case of disparate impact, again relying on the lack of notice argument.

The court has reviewed the file in this action and finds, contrary to the defendant's representation, that the plaintiff did, in fact, provide the defendant with notice of the plaintiff's intent to make a case for disparate impact. The pretrial stipulation submitted by the parties and signed by both counsel for the plaintiff and counsel for the defendant, lists both disparate treatment and disparate impact as possible theories for the plaintiff's case. *See* Pretrial Stipulation at 4 ¶ 9(b). There is, thus, no justification for the defendant's claim of surprise at trial as to the plaintiff's reliance on a theory of disparate impact.

Moreover, the objections lodged in the defendant's proposed findings of fact and conclusions of law are generalized articulations on the part of counsel made after the close of all the evidence. The plaintiff's statistical proof consisted of evidence of the defendant's overall job classification process as well as evidence introduced to show that the overall discharge process was discriminatory in application. Such evidence is admissible to prove discrimination. *Griffin v. Carlin*, 755 F.2d 1516, 1524 (11th Cir.1985).

■ The plaintiff's introduction of evidence regarding the discharge rate of blacks compared with the discharge rate for whites in the defendant's workforce is particularly compelling. The plaintiff's substantiated claim that blacks were three to five times more likely to be discharged than whites during the years 1983 through 1986, was unrebutted by the defendant. The plaintiff's standard deviation analysis strongly discounts any suggestion that the differences in discharge rates for whites and blacks were due to chance. The numbers of standard deviations presented by the plaintiff for the years 1983 through 1986, exceed three standard deviations. As a general rule, when the difference between the expected number of discharges is greater than the observed number by more than two or three standard deviations, the suggestion that the number of discharges is random is suspect. See *Castaneda v. Partida*, 430 U.S. 482, 497 n. 17, 97 S.Ct. 1272, 1281 n. 17, 51 L.Ed.2d 498 (1977).

The court is satisfied that the plaintiff established a *prima facie* case of discrimination, through the use of statistics. This does not mean that the plaintiff's statistical evidence was not subject to attack, or that the defendant could not have rebutted the plaintiff's evidence. The point remains, however, that no attempt was made by the defendant, aside from unsupported argument offered by counsel after the conclusion of the trial. Once the plaintiff established a *prima facie* case of discrimination

as to his claim of disparate impact, the burden of persuasion shifted to the defendant to prove that the plaintiff's statistical proof was unreliable or that the challenged practices were justified through business necessity. *Eastland,* 704 F.2d at 619. The defendant's failure to do either results in victory for the plaintiff as to this portion of his case. *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981) (discussion of the role of the *prima facie* case as used in the employment discrimination context).

## DISPARATE TREATMENT

The plaintiff has also alleged a claim for disparate treatment under Title VII by alleging that the plaintiff was discharged from his job with the defendant on account of intentional racial discrimination. To establish a *prima facie* case of disparate treatment the plaintiff must show: (1) that he is a member of a protected group; (2) that he was qualified for the position held; (3) that he was discharged; and (4) that he was replaced by a person outside the protected group or was discharged while an individual outside the protected class with equal or less qualifications was retained by the employer. *Conner v. Fort Gordon Bus Co.,* 761 F.2d 1495, 1498 n. 4 (11th Cir.1985); *Lee v. Russell County Board of Education,* 684 F.2d 769, 773 (11th Cir. 1982). (The original formulation of this test was set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed. 2d 668 (1973)).

Once established, "the *prima facie* case of discrimination raises the inference that discriminatory intent motivated the discharge of the employee." *Conner,* 761 F.2d at 1498 (emphasis added). The burden then shifts to the defendant to rebut the *prima facie* case. *Id.* If the *prima facie* case contains only circumstantial as opposed to direct evidence of discrimination, the "employee may rebut the presumption [of discriminatory intent] by clearly articulating in a reasonably specific manner a legitimate non-discriminatory reason for the discharge." *Id.* at 1499. At this point,

the burden of production then shifts back to the plaintiff who "must show that the proffered reason was a pretext for the true discriminatory reason." *Id; See generally Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *McDonnell Douglas,* 411 U.S. at 792, 93 S.Ct. at 1817.

■ The burden placed on the employer to rebut a *prima facie* case of disparate treatment formed on the basis of circumstantial evidence, is a burden of production only. *Perryman v. Johnson Products Co., Inc.,* 698 F.2d 1138, 1142 (11th Cir.1983). In certain cases, however, the burden of production is somewhat heavier. One such example, as is presented here, is when a defendant relies on a "purely subjective reason for discharge." *Conner,* 761 F.2d at 1499 (citations omitted).

■ The defendant contends that the plaintiff has failed to establish two of the three elements required for stating a *prima facie* case of disparate treatment. First, that the plaintiff was not qualified for his job because the plaintiff lied on his employment application with the defendant and second, because the plaintiff was not replaced by a person outside the protected group.

The plaintiff introduced evidence that the defendant retained another employee, a native of Thailand, who also had difficulty speaking English. This individual worked with the plaintiff in the Purchasing Department. Although the court has found that the plaintiff did not prevail on his contention that the other employee's English skills were as deficient as the plaintiff's or that this deficiency significantly handicapped the plaintiff's co-worker in the performance of his job, the court is satisfied for reasons set forth below that the failure to satisfy this element of the *prima facie* case is not by itself dispositive of the plaintiff's claim of discrimination.

The defendant has also charged that the plaintiff was not qualified for his job with the defendant because the plaintiff lied about being fired from his previous employer. Although the defendant did not make its argument entirely clear, argu-

ment by counsel at tiral suggests that individuals who have been terminated from previous jobs are not eligible for employment with the defendant either because of a poor work history or because of a falsification of the application for employment. Apparently the plaintiff's falsification of his job application was not known to the defendant at the time of the plaintiff's employment. No explanation was offered as to why the plaintiff's references were accepted unchecked.

Acceptance of the defendant's contention that the plaintiff failed to show that he was qualified for his position with the defendant does not, however, destroy the plaintiff's effort to establish a *prima facie* case under Title VII. The Supreme Court has made clear that a plaintiff may establish a *prima facie* case of disparate treatment through a less than perfect showing of all of the necessary elements. *Burdine,* 450 U.S. at 254 n. 6, 101 S.Ct. at 1094 n. 6. The trial court is not required to blindly adhere to the elements of the *prima facie* case, but instead must staisfy itself that the plaintiff has borne his burden of proving by a preponderance of the evidence that the circumstances under which the plaintiff was fired raise an "inference of unlawful discrimination." *Id.* at 254, 101 S.Ct. at 1094.

The court is, again, satisfied that the plaintiff has established a *prima facie* case. Having established a *prima facie* case, the burden of production shifts to the defendant to articulate in a "reasonably specific manner a legitimate non-discriminatory reason for the discharge." *Conner,* 761 F.2d at 1498.

The defendant introduced into evidence the testimony of three witnesses, in addition to the plaintiff's direct supervisor, who established that the plaintiff did not adequately perform his job because of the plaintiff's inability to speak and understand English. The court has found the testimony of the witnesses and the plaintiff's supervisor to be credible. This testimony was sufficiently specific to rebut the plaintiff's *prima facie* case. The court reaches this conclusion despite the "subjective ele-

ment" involved in the plaintiff's firing. While it is true that the plaintiff's supervisor made the ultimate decision to terminate the defendant from his job in the Purchasing Department, the defendant has adequately shown that the reasons for this decision were based in fact and were legitimate in the face of the plaintiff's job performance. *See Id.,* at 1499 ("a standard known only to the employer and interpreted only by the employer [may] [ ] nevertheless be clear, specific, and capable of objective evaluation. . . .").

In the face of rebuttal of the plaintiff's *prima facie* case, the plaintiff has the opportunity to demonstrate that the reason or justification offered by the defendant for the plaintiff's termination is merely pretextual. *Id.* at 1498. This burden "merges with the ultimate burden of persuading the court that the [plaintiff] [ ] has been the victim of intentional discrimination." *Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095. The plaintiff in the instant action has attempted to show pretext through the introduction of evidence regarding the alleged better treatment accorded the plaintiff's co-worker; the statements of the Personnel Office to the Job Service counselor; and through the introduction into evidence of a letter of recommendaiton written for the plaintiff by his immediate supervisor.

The court has found the plaintiff's claim that his co-worker's English was as poor as the plaintiff's to be unsubstantiated. Moreover, the statements of the Personnel Department to the Job Service counselor did not correspond to the statements of three individuals who witnessed firsthand, the plaintiff's performance on the job. The court found the testimony of the plaintiff's co-workers to be convincing. The defendant has, therefore, "articulate[d] . . . a clear and specific reason for discharging . . ." the plaintiff, thereby sustaining the defendant's burden of production. *Conner,* 761 F.2d at 1499.

The court also has found that the defendant offered a reasonable and credible explanation for the letter of recommendation provided to the plaintiff by his supervisor. The plaintiff, therefore, has failed to sus-

tain his burden of proving by a preponderance of the evidence that the plaintiff was the victim of unlawful discrimination on his claim of disparate treatment. *Burdine,* 450 U.S. at 254, 101 S.Ct. at 1094.

## CONCLUSION

The plaintiff seeks multiple relief including a declaratory judgment that the defendant's employee classification practices violated Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* (disparate impact claim); a declaratory judgment that the defendant's employee discharge practices violated Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* (disparate impact claim); a declaratory judgment that the defendant's discharge of the plaintiff violated Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* (disparate treatment claim); injunctive relief reinstating the plaintiff to a comparable position to the one he held prior to termination; awarding the plaintiff back pay in the amount of $7,457.68; and enjoining the defendant's classification and discharge practices.

After a thorough and searching review of the evidence adduced at trial the court finds for reasons set forth above, that the plaintiff is entitled to a finding that the defendant's employee classification practices and discharge practices violated Title VII. However, for reasons set forth above, the court finds that the plaintiff did not prevail on his claim of disparate treatment and, hence, a declaratory judgment in favor of the plaintiff as to this claim may not be granted.

The court does consider it appropriate under the circumstances to order the defendant to reinstate the plaintiff to a comparable position to the one the plaintiff held prior to termination, and the court is satisfied that the plaintiff has established that he is entitled to a back pay award, including fringe benefits, in the amount of $7,457.68.

The only matter remaining for the court's determination is the plaintiff's request for an injunction against the defendant's classification and discharge practices. In framing an injunction a court must " 'be specific in terms' and 'describe in reasonable detail ... the act or acts sought to be restrained....' " *Payne v. Travenol Laboratories, Inc.,* 565 F.2d 895, 897 (5th Cir. 1978), *cert. denied,* 439 U.S. 835, 99 S.Ct. 118, 58 L.Ed.2d 131 (1978) (quoting Fed.R. Civ.P. 65(d)).

Presumably in requesting an injunction against the defendant's classification and discharge practices, the plaintiff is seeking injunctive relief only for himself. Narrowing the focus of injunctive relief to that of one plaintiff and one particular defendant, however, does little in this case to assist the court in meeting its burden under Rule 65(d). The plaintiff did not present evidence of alternative employee job classification schemes or discharge practices which might aid the court in framing the sort of relief the plaintiff seeks. Instead, the plaintiff requests the entry of what amounts to an " 'obey the law' " injunction. *Id.* Accordingly, the request for injunction is denied.

The plaintiff shall, within ten (10) days from the filing of this order, submit a proposed final judgment which reflects the relief granted herein. The court retains jurisdiction to determine the matter of attorneys' fees and costs upon appropriate motion of the plaintiff.

DONE AND ORDERED in chambers at Fort Lauderdale, Florida, this 11th day of September, 1987.